New Orleans for various reasons, and I'm sure she deeply regrets not being here, but this setup allows her to ask questions, and feel free to direct your discussion as normal. We have an interesting docket this morning. We also have traffic lights, so it would be of some value if you try to confine your remarks to the allotted time. When the yellow light comes on, you have two minutes. When the red light comes on, we ask you please to stop talking unless you're answering a question from the court. What else do I need to say? That's all. Well, we are familiar with the briefs and record excerpts, but we have not normally read the entire record before we come here, so we appreciate you giving us record citations. The first case is Marquette Transportation v. Navigation Maritim Bulgar, Bulgarian Company v. Thomas Johnson, case number 22-30261. The way this is allotted, we'll hear first from Balkan Navigation, Mr. DePaula. Good morning, Your Honors. May it please the Court. My name is Tim DePaula, and along with Peter Sloss, I represent Balkan Navigation, Navigation Maritime Bulgar, Navi Bulgar, as we call it for short. Certainly, because of the time, I would like to allot five minutes for rebuttal. Yes. Thank you. And as you said, we briefed all of these issues, and because of the time, I'm really going to focus. There's five issues we presented for appeal. Well, four. One was brought up by the Court on its own. I'm really going to focus on issues two and three. That's fine. You waived nothing. Okay. So, issue two deals with the jury's finding that Marquette, in this case, was not negligent. We think that that was clearly illegally erroneous in light of an admitted statutory violation, in light of an admitted violation of a Coast Guard rule. In this case, we're dealing with 33 CFR 165.810. The jury was instructed on that statute specifically, and within the statute, it talks about you have to be in strict compliance. There's no dispute in this case that our client, the vessel that was at anchor, was part of the class of persons intended to protect from this statute. There's also no dispute that the Marquette captain violated the statute. Is that the one that requires you to give the most reasonable leeway to the other vessel? Yes, ma'am. That's the one that says you have to give as much leeway as circumstances permit, and there's a second component. You have to reduce speed. And I know the argument is, well, it wasn't reasonable. He didn't have to do it. He didn't think he had to do it, but that's not the standard of the statute, and that's not strict compliance. Strict compliance is, could you have gotten over more? Well, they say you didn't preserve this issue. They say that we waived that argument, and we did not for a few reasons. I don't think we waived any of the arguments. Number one, if you look at the Unithrone case and the other cases that are cited, it talks about sufficiency of the evidence arguments, and that's what's waived if you don't argue the Rule 50 motion afterwards. Marquette's negligence, Balkan's damages, which are issues two and three, that's not sufficiency of the evidence arguments we're making on those two things. Number one, it's part of our counterclaim. It doesn't make logical sense that we would actually move for a Rule 50 motion after our case-in-chief, the same way Marquette didn't do it after their case-in-chief. But secondly, we're arguing for the statute, not insufficiency of the evidence, but that the jury misapplied the evidence to well-established legal principles. Let me ask you this. In a normal case where, in a case where the jury has to consider whether compliance with the leeway rule or the reduced speed rule was established or whether those rules were violated, is the jury essentially making a fact determination about whether enough leeway was given or whether speed was reduced? Correct, yeah. They're basically saying, did he reduce speed at all, period. And what you're saying is the jury just was irrational in determining that these rules were not violated? Yes. What I'm saying is they took the undisputed testimony, because everybody has admitted, even the captain and their expert, he did not slow down. In fact, the expert said he's glad he didn't slow down. And what I'm saying is they took that fact, undisputed fact, and just completely disregarded it. And it's not like they found Marquette was negligent and violated the statute, but that wasn't an approximate cause of what happened. They just didn't find him negligent at all, which I think is just clearly and legally erroneous, which is not a sufficient evidence argument, getting back to your question, and it's not waived under the Unithorne case. The second issue . . . The statute was presented to the jury. I know. What testimony did you have to counter that? Well, we agreed . . . I know they said they did not slow down. But whether that . . . You know, if the ordinary speed going at that time was 30 miles an hour downriver, as opposed to 11 to 13, which they were traveling, then they would have been going slow. I apprehend from the briefs 11 to 13 is pretty fast. But the jury had to have testimony that would have explained that, right? Well, it wasn't presented in a way that you're going too fast and you need to slow down. It was presented more in the way of whatever speed you're going, it doesn't matter. You need to reduce that speed. And what testimony did you have to make that argument? Every expert that I got up there agreed with that. Marquette's expert agreed with the statute, Captain Berry. Our captain, Captain Gibbs, agreed with that. Marquette's captain on the tug agreed with that as well. Is 11 to 13 miles an hour with the current or not counting the current? It's with the current, Your Honor. It's with the current. And it's essentially, I think the testimony bore out at trial . . . You gave a good point. It's at 30 miles an hour, 11 to 13. It's essentially as fast as this tug should have been going. I mean, and that testimony was borne out as well. But your entire damages were about $140,000 or so? Our damages, the repair damages, were $107,000. And then we had a lost charter of that $352,000. And then we had some miscellaneous charges, delayed charges. We were in the river that made up the bulk of that. The total claim of Balkan's damages actually was around $770,000. And that's the third issue. The second issue I'm going to address, the third issue in the briefs of what we found was clearly and legally erroneous. There was undisputed testimony in regard from our two members of Balkan, Emil Kolov and Emil Yordanov. They testified to the repair invoices that the vessel incurred. Even Marquette's claim manager who testified, Ryan Dupuis, it's clear the vessel was damaged. I mean, we put pictures into the record. We put 47 pages of invoices into the record. There's a hole in the side of the strata. That's not disputed. This is a collision. And it got repaired. So the repair costs, the lost charter, that was really not controverted by anybody. There was some discussion about some profits, the daily profit rate and things of that nature on the charter. But all in all, they didn't dispute that we lost the charter or that we needed to get repaired. And so for the jury to come back and say we're 50% negligent, the pilot's 50% negligent, we don't take his fault, but we have zero damages with the uncontroverted evidence is legally wrong. They just frankly ignored it for whatever reason. If we were to uphold the liability findings, that goes out the window, right? If you would hold the 50%, we would still be entitled to our damages from the pilot. From the pilot. Correct, Your Honor. Yes. Because we are not, in this case, as an interim vessel, which is the strange, abnormal thing about this case when you're dealing with collisions. Well, I know it's tripartite. Okay. Yeah. So if everything stays the same, but we should have damages, then that would be 50%, whatever ours would be, would be reduced by the 50%, but then the rest would be included by the pilot. So our position, though, is that the jury cannot just summarily disregard the undisputed fact that the vessel was damaged. You can get into the questions about the charter. You can get into the questions about the other invoices. Maybe some of them are . . . we think they're all related. Obviously, Marquette didn't think some of them are related, but none of that bore out with the repair charges. So if Marquette prevails, you're jointly and separately liable with the pilot. And, of course, the pilot has raised these issues about how the law . . . what standard of duty, what level of proof are necessary. What if we were to agree with that, agree with those contentions? How would that affect this whole tripartite arrangement? Well, we would have to go back to the trial court, have a new trial, and then the jury would have to . . . or whoever, the judge, would have to . . . And, it would require a new trial for everybody. That would require a new trial for everybody. I don't see how you would be able to put on the evidence of a trial for the pilot's gross negligence under the right standard without having the vessel there as well because of the situations. Because, like you said, we're not going to be liable for the pilot's actions if he's grossly negligent. If he's not, then it's just all on us. Right. So, it has to go back. And, that's what we're asking for the entirety of this. I mean, I think the correct call here is to remand it for a new trial. I know there's only 20 seconds left. And, I said a jury or a judge. And, Your Honors brought up the jurisdictional issue on its own on appeal. I just will note that we did object to the jury trial. It was rejected by the trial court. We don't believe the jury trial was correct. We don't think that Marquette has pled diversity correctly. You didn't object on that basis? We did not object to that basis. But, we . . . Not controversy and not diversity of citizenship. That is absolutely correct. But, I still think that we objected in that we didn't consent to the jury trial. Okay. And, my time. Thank you very much. All right. Thank you. You have rebuttal at the time. Good morning, Your Honors. Good morning. May it please the Court. Alan Davis on behalf of the cross-appellant, Captain Robert Johnson, who was the state compulsory pilot on board the motor vessel, Stranger. The two issues I'd like to focus my time on today are, one, the issue that you've raised, Judge Jones, regarding the evidentiary standard that was applied. And, then the admission of an accident reconstruction that I don't believe was properly in evidence. The first Congress of the United States recognized in its ninth legislative act, which actually predates the Judiciary Act by which federal courts were created by six weeks, it recognized the principle that pilotage on the navigable waters of the states had been regulated by the states as sovereigns prior to the Constitution. And, Congress adopted a rule that those regulations were adopted as federal law and delegated future regulatory authority over pilotage to the states. Louisiana has exercised that regulatory authority by passage of Revised Statute 34-1137, which is all of one sentence. It says that if you want to sue a pilot for damages when he's acting under a state commission, you must do two things. You have to meet the burden of proving gross negligence, and you have to meet it with clear and convincing evidence. Prior to the trial in this matter, the district court ruled that the plaintiff, Marquette, would be required to meet the first requirement of 1137, proof by gross negligence, but not the second, proof by clear and convincing evidence. It reached that decision because in the district court's view, general maritime law, in other words, judge-made law, preempted the federal government, the Congress' adoption of Louisiana's statute as controlling law. It did so without any reference to that statute, which is 46 U.S.C. 8501. That's your argument. I don't see how much more you need to say about that. Okay. But I am concerned about the consequences of the argument. How is that, Judge? Well, in other words, your client is asking for a new trial or what? Actually, Judge, I don't believe that a new trial is necessary. I think that it could be remanded for a new trial, but the Pullman and the Kelly decisions that we cited held that a new trial was necessary unless the court undertakes a de novo review of the evidence and determines that it wouldn't meet the clear and convincing standard. So the court can look at the evidence in this case, and we briefed that extensively in our brief. The evidence in this case consists of an accident reconstruction that we'll get to in a minute, an audio recording of the incident that was played for the jury several times, which the district court even ruled beforehand she would not allow a transcript of the recording to be presented because the recording was not clear enough. She wanted the jury to try and discern what they could from the recording, not let the parties submit their version of what was being said. That seems to put us as a court of appeals in the position of a jury, which seems uncomfortable to me. What, again, are the best cases you have for that proposition that we could review the evidence and determine whether there was clear and convincing evidence of gross negligence? Yes, Judge. It was Pullman, P-U-L-L-M-A-N, and Kelly. I don't have the full sites in front of me, but they're cited in our briefs. And what they held is that reverse is required unless the record permits only one resolution. That was the line, is only permits one resolution. And, again, we believe that that's the case. I know that's a high standard, but I hear what you're saying. One of the elements of a gross negligence claim is that the pilot had actual subjective awareness of an extreme degree of risk. Of what? Of an extreme degree of risk. And I would submit that there is no evidence in the record that the pilot, that Captain Johnson, had actual subjective awareness of an extreme degree of risk. The evidence that was relied on to try and make that argument was that he supposedly ignored warnings of the master of the ship that there was an approaching tug. You can hear that clearly on the recording from the bridge that day. What happened is the master said twice, Mr. Pilot, the tug. And the pilot said, it's fine. That's what he said, it's fine. Not, I don't care. Not, I'll let him hit us. He said, it's fine. Now, he may have misappreciated the risk, but he did not have actual subjective awareness of the risk. Well, of course, I mean, that's not the only basis for the jury to assess what Captain Johnson was doing, right? In other words, there's all this information in, I guess, it's Marquette's brief about his having lied and lied under oath and being admonished by the judge and, you know, suspended from the Pilot's Association. So, what do you say about all that? Yes, Judge, and I will be the first to admit Pilot Johnson has spent a lot of his life practicing and becoming a pilot, and this was his first attempt to sit under the lights of federal court and answer questions. There were questions that he answered incorrectly, not because he was trying to be deceptive, but because he didn't understand the question, and he was just flustered, I think, is the response to that. Well, did this go before the jury that he had lied? It was brought out, and his testimony was impeached on the issue of whether he had been previously suspended or sanctioned by the Pilot's Association. We also obtained a pretrial ruling that the Board of Commissioners' findings and conclusions regarding his incident were not admissible as evidence. So, we also take the view that that was erroneous for the judge to allow that because when you say that the Board of Commissioners' findings and conclusions about an incident are not admissible because it's an administrative body applying a different standard, to then ask him about the effect of those findings and conclusions, the suspension, the fine, and it was, I think, a $1,000 fine for this incident, the fine was the finding and conclusion. So, I think it also got evidence in front of the jury that should not have been in front of the jury. Did you raise that on appeal here? We've not raised that issue specifically on appeal except in the context of the broader argument that the evidence didn't meet the standards. Of clear and convincing. Correct, Judge. I mean, did Johnson, he didn't even admit he made a mistake, though, right? He doesn't admit that he made a mistake other than he assumed that the pilot of the Kiefer-Bailey, Captain Nobles, he assumed he had more experience and would know that as he approaches the anchorage, he's got to move over a little bit. Normally, does the downriver tow, they have the right-of-way, right? Well, yes, they would have the right-of-way over another vessel that's navigating. The Strange, at the time of the incident, was anchored. It had an anchor on the bottom of the river, and actually it was the force of that anchor chain that was pulling it out into the river. It wasn't anything that was being done on board the bridge to... Was it the opposite anchor raised? Right. Correct. As soon as the opposite anchor broke the mud, there's nothing now. This anchor chain is stretched out. The starboard anchor chain is stretched out. And when the port anchor comes off the ground, the weight of the anchor chain pulls the vessel, and everybody on board the Strangia, the master, the third officer, and Pilot Johnson... Knew that would happen. Knew that would happen. They said it's uncontrollable, it's a natural movement. So there was nothing that could have been done. But the Strangia ends up 300 yards into the channel past the anchorage, right? Roughly speaking. The bow of the Strangia. The stern was still in the anchorage. Right. But what I don't understand about that, but the keeper, Bailey, didn't know that. Correct. And the argument that was made is the keeper, Bailey, should have known that because, again, it's a natural movement of a vessel that's weighing anchor. The Strangia had an assist tug next to it. It was showing that it was... All indications are that it was weighing anchor, which means it's going to start doing those natural movements. Now, but what I meant about asking who has the right-of-way is, does the downriver vessel normally have a duty to communicate with the things it may encounter, the vessels that... I mean, he did... He said, you know, I couldn't give way to the port side, I suppose, because this other vessel was coming upstream, so... If he perceived the Strangia to be a vessel underway, then, yes, he would have a duty to communicate and arrange a meeting agreement with it. He didn't do that. He didn't communicate except to blow a two-whistle signal, which is an indication that he's about to move to port, again, exactly what the Strangia would have expected in that situation, that he's approaching very close to the anchorage, but that when he needs to, a very maneuverable tug will move over and get out of the way. And briefly, the second issue that I'll just raise in the limited time I have left, there was an accident reconstruction video that was admitted into evidence without being supported by an expert witness. Our contention is that the accident reconstruction video is inherently opinion. Mr. Cunningham, who has been qualified as an expert in accident reconstruction, who introduced himself to the jury in the very first sentence of testimony in this case as an expert, who described his specialization as accident reconstruction and forensic analysis of voyage data recorders, he testified that that video he created was, in his words, the most accurate reconstruction and the best way viewable in his opinion. Accurate? Most accurate and best way viewable are inherently opinions. But I thought you didn't object to that. We objected to it several times before the trial. To what? To the admission of the accident reconstruction video without being supported by expert testimony. But you're saying it came in with testimony. It came in with what was allowed as non-expert testimony, classifying it as summary evidence, the summary being a summary of . . . Right, they put together all the databases. Of thousands of pieces of GPS data, of satellite imagery. But you didn't object to that mechanical putting them together, did you? Well, we didn't know how it had been done until trial because since he didn't have to go through expert disclosures, we didn't have a report about how the video was created in the first place. But you don't have any reason to think that was inaccurate, do you? I mean, because presumably every bit of data that was being put together had time stamps on it so that it could be accurately collated. So there was one set of data which you referred to as publicly available GPS data that's never been identified. I'm sorry, AIS data, not GPS, that's never been identified or put in the record that I still don't know what it is. Beyond that, we do think there were inaccuracies in the presentation in terms of the attempt to present depth, there was an initial version, the version of the video that was produced to us had a scale at the bottom of it that was very inaccurate. That was removed overnight before trial. The version we saw for the first time at trial did not have that scale anymore. So we had a lot of problems with the reconstruction itself. We just didn't have the normal expert disclosures that you would have for an accident reconstruction expert in order to be able to challenge those effectively. Well, I'm keeping you over, but I have one more question. I don't mind. If this were a traffic court case and you had an accident reconstruction person, would that be treated as expert evidence? I think it would make sense, honestly, for there to be a rule . . . But you're not in traffic court, I suppose. Right. I think for purposes of this case, it's . . . The judge was troubled in this case, and it reads in her opinion that she reviewed Fifth Circuit case and didn't find anything that required her to look for an expert report. I think there needs to be precedent for future judges and for this case that an accident reconstruction normally should be presented with expert opinion, and actually the Amdur Proof of Facts has a very concise statement to that effect. I don't know that you need to go as far as to say in every case, you know, traffic accident . . . I don't think there's harm in doing that, but at least I think there should be some precedent that the district court can look at and say, where I'm looking at a reconstruction that was created with synthesized data from multiple sources, time synchronizations, superimposed anchorages, all kinds of these different things being presented in a three-dimensional perspective-based computer using proprietary computer software. I think a district court needs something from the Fifth Circuit to say, if you find these things, you can require expert evidence in order to support that exhibit. Okay. You have time for rebuttal. Thank you, Judge. All right. Mr. Kratz. Good morning. May it please the Court. I obviously have several issues that I have to address. I'd like to start by addressing the Court's questions about jurisdiction, followed by the arguments about trying the case to the jury, and then after that, I'll respond to appellant's arguments, if that's okay with the Court. On the question of diversity jurisdiction that the Court raised in its briefing notice, I think there's a couple of important points to make. The first is the question of whether diversity jurisdiction exists over Marquette's claims against Balkan is separate from the question of whether this Court or the district court had jurisdiction over this case. I think everyone agrees and everyone understands that Balkan's counterclaims against Marquette, Marquette's third-party demands against Robert Johnson, Marquette's Rule 14c tender to Robert Johnson, all of that is based in admiralty jurisdiction. I don't think anybody, including the Court, as I understand it, questions that there was jurisdiction for that. Then what . . . I mean, what . . . Yeah, and I thought about that, and I'm sorry to get you off track, but what status do the jury determinations have on those issues that were maritime that . . . I guess you're arguing that it doesn't matter that the parties can consent to a jury trial even in admiralty. Sure, and actually, Judge Jones, I can answer your question without deviating from my current course because the answer to your question is found in the same opinion authored by the district court that answers the question on diversity, and that is there was a motion that was filed by Balkan to strike the jury demand on the basis of . . . Judge Duncan, you pointed out an amount in controversy argument and then an argument that Marquette had made a tacit designation under Rule 9h to proceed in admiralty. District court rejected those two arguments. Nobody challenges those decisions on appeal. And then the district court did something else, which I think is controlling over both the diversity question and the jury trial question that Your Honor raised. And what the court said was . . . said two things. First, I find as a matter of fact that jurisdiction is present, and I'll come back to that in a moment, but I want to answer Your Honor's jury question directly. And then the judge said there are clearly issues in this case as to what portions, if any, of this case ought go to a jury. I find that those are complex questions that have not been adequately briefed. I'm using I. I'm speaking as the district judge. She found that there were complex questions that had not been adequately briefed, and so she invited the parties, very specifically in her opinion, to submit further briefing on the question of what portions of the case, if any, would go to the jury. Well, what happened after that was the district court set the case on its docket as a jury trial. Marquette, of course, didn't file any motions or file any further briefing because we wanted a jury trial. We were perfectly happy with the jury trial setting. But in the 18 months that passed between the district judge's opinion inviting briefing on whether there would be a jury trial, on all claims or some, and the commencement of the jury trial, the defendants didn't file anything. Right. And not only did they not file anything, but they didn't file anything challenging the jury trial, but they filed a host of pleadings in which they identified the case as a trial by jury. Okay. Various motions, several iterations of the pretrial order. Okay. So consent. Excuse me? Sorry? You're saying consent. And I'm saying that operates as consent under Rule 39C. That's the jury argument. To return briefly to the diversity argument, Judge Brown, in her opinion, specifically identified, recognized, that the citizenship of Marquette's, as an LLC, had not been properly pled in the pleadings. But then she went on to specifically say, but I find that Marquette is clearly a U.S. citizen, and so therefore diversity jurisdiction is present. And here's where I think this case is perhaps a little bit different from, at least as far as I have been able to tell, all of the LLC citizenship cases decided by this court. Because this court's jurisprudence on pleading the citizenship of an LLC has come up, as far as I can ascertain at least, exclusively in the context of 1332A1 jurisdiction, where we're deeply concerned about whether there's complete diversity. I know where you're going on this, and my first observation is that this case has been tried, and all the briefs talk about pleading this, pleading that, but it is in the Supreme Court that after the case has been tried, you can't rest on your pleadings about diversity. You had to have proof. That's my first observation. I don't see the proof. But you can tell me where it is. My second observation is that even though I understand a theoretical argument that this is different because you're suing a foreign company, nonetheless, the Supreme Court has given us no indication that we treat an LLC differently for proof purposes, period. And suppose a member of this LLC were in fact a citizen of Mexico or a citizen of Greece. I'll bet you there are Greeks who have LLCs registered to do business in the U.S. in a shipping context. I can address Your Honor's specific concern on that, and I think we raised this in the brief, too. So there's a few things, and I want to try to hit all of them, but to address directly your question about proof, there is certainly evidence in the record that Marquette is a citizen of the United States, and we did discuss this in our brief, and I'll mention this. So it is undisputed that the Kiefer Bailey Marquette's vessel that was involved in the collision is a U.S.-flagged vessel. That is a significant fact under federal law because U.S.-flagged vessels who have a certificate of documentation from the U.S. Coast Guard must be, we cited the statute in our brief, wholly owned by U.S. citizens.  We cited that in our brief, and we noted the Jones Act that requires that the vessel be wholly owned by U.S. citizens. So there is certainly some record evidence to indicate that Marquette is a U.S. citizen. We also have the district court's specific factual finding made in that opinion I referenced a moment ago. But at the time, did she have that certificate? I mean, was she even considering it? That looked like a rather conclusory discussion to me. I don't disagree. Again, it was all couched about pleading this, pleading that. I don't disagree with you, Judge Jones. The district court offered a short discussion of that. But I think my counterpoint to that is the district court made a specific factual finding and no party has challenged that factual finding on appeal. This court specifically invited... They did say you didn't have the adequate proof. Respectfully, Your Honor, they did not say that. What they said in their brief was that we did not properly plead our citizenship. It doesn't matter. It's jurisdictional, right? It is jurisdictional, Your Honor. Okay, so let's not go... All your brief is waiver, waiver, waiver, waiver, waiver, and I wasn't persuaded by at least half those, and it's certainly not accurate here. Where the case has gone to trial, this is a jurisdictional issue, and I was asking about proof, and you have offered proof. Yeah, and to be clear, Your Honor, I don't want there to be a misunderstanding about our position. I am not contending that any party has waived challenges to jurisdiction. This court, and obviously... I know, but so then don't quibble about their argument. But my point is that once a district court makes a factual finding... That was my narrow point, and I apologize that I was not more clear about this. Once a district court makes a narrow factual finding, I think it is relevant, not dispositive, but relevant that no party challenges the accuracy of that factual finding on appeal. That's all I intended to say, and I apologize. Just to understand, if we hypothetically found that the defendants consented to a jury trial, do we have to worry about diversity, jurisdiction, and the citizenship of the members of the LLC? So I would argue no. I think the court... There's a couple of things the court could find, and I think this is inherent in Balkan's arguments on the issue of whether it was appropriate to try the case to a jury. Balkan's argument is diversity was not properly pled, therefore it was error to try the case to a jury because there's no right to a jury trial in admiralty, which I think Balkan agrees that there clearly would have been admiralty jurisdiction over Marquette's claims had they not been brought in diversity. Nobody disputes that. I don't think that would be disputable in good faith. And so then we're back to my arguments about Rule 39C consent. I'd like to move on to some of the other issues, and I'd like to first start, I think, where Judge Jones, you alluded to this a moment ago, and that's on the question of there's a lot of sufficiency of the evidence arguments that are before this court on appeal. We have made some waiver arguments with respect to that, and ultimately what defendants are requesting on their sufficiency of the evidence arguments is a new trial. I think my colleague who represents Balkan said, you know, we want to have a new trial. Reading from the U.S. Supreme Court's case decision in Unitherm, where Justice, I believe it was Ginsburg, described at the court's holding, she said these outcomes, she had discussed a number of cases before that, merely underscore our holding today. A party is not entitled to pursue a new trial on appeal unless that party makes an appropriate post-verdict motion in the district court. That is the Supreme Court's clear holding in Unitherm. Justice Ginsburg described that as the court's holding in Unitherm. I'm 95% sure I'm correct. I'm sorry, it was Justice Thomas, it was not Justice Ginsburg. The other side's response to that is, no, no, this isn't a sufficiency argument. This is something else. That's correct, Your Honor. That is their argument. I go back to what Justice, I misquoted it as Ginsburg a moment ago, what Justice Thomas said, which is a party is not entitled to pursue a new trial on appeal unless that party makes an appropriate post-verdict motion in the district court. So what Justice Thomas with the court held in Unitherm is actually slightly broader than the argument that we have, what we said in our brief was sufficiency of the evidence arguments are waived unless a Rule 50B motion is made. I think that is correct, a correct statement of law, but my point is what Justice Thomas, what the court said in Unitherm was actually broader than that. And so that I think is, and I'm not going to say anything else about waiver today other than to make that point. To go through the other points that were made by my colleagues on argument, Balkin's challenge to the jury's finding that Marquette was not negligent. I think that Balkin overstates what I'm calling the regulation, that's 33 CFR 165.810B2 says. And Judge Jones, you started to get at this a little bit in your questions. The regulations say that a passing vessel must give the other vessel as much leeway as circumstances permit. Right. And what Balkin has said is, and the rule also requires that the vessel reduce speed. Respectfully, that's not correct. That's not what the rule says. What the rule says is a passing vessel must reduce speed sufficiently to preclude causing damage to the vessel passed. And that language from the rule, which is not quoted by Balkin in its briefing, is in our view dispositive. Because that brings the question back to what Your Honor's asked counsel for Balkin about, which is whether an application of the rule requires an evaluation of the reasonableness of the party's actions. And the answer to that question is yes, it absolutely does. If we think for just a moment about what happens if we interpret the rule in the way requested by Balkin, which is that vessels must always slow down when they pass other vessels, Judge Jones, you sort of started to get at this when you asked a question, does it matter how fast they were going to start with? And the answer is absolutely. If you have a vessel going downriver going, I'm going to pick a very slow speed for illustration, five miles an hour, and the rule is, well, you have to slow down no matter how fast you're already going. I mean, let me just give you the layman's analogy that rose in my mind while I was thinking about this. Your client is going downriver at a fairly brisk pace, right? I would disagree with that, Your Honor. Is 11 to 13 slow? 11 to 13 is a pretty standard speed on the river. Okay, well, okay. Captain, if I may, Captain Gibbs, who testified as an expert on behalf of Balkin, said that he passes that anchorage at that speed routinely. Okay, fine. But then you see this giant container vessel, which is clearly weighing anchor. Why is this not analogous to a traffic, and I'm sorry to put this in such dumb terms, a traffic case where you're driving along a street, there's parking along the street, and you see another truck backing out of the parking place. Who has to give way in that situation? Clearly the driver who's going down the street. So why isn't that a good analogy? So the reason why, I think, Your Honor, is because the motor vehicles in your analogy are significantly more maneuverable than the vessels at issue here. So the key for Bailey... This guy only had six barges on the tow. That's not a big tow, right? Respectfully, actually, it is, Your Honor. Six fully loaded barges. And that... I mean, we see them, and we've had cases where they have 12 or 18, right? So certainly there are larger tows, but a tugboat without any barges attached to it is extremely maneuverable. Nobody disputes that. But once you put a load of barges on the front of it, particularly a fully loaded set of barges, it becomes about as maneuverable as your average 18-wheeler. And it is not very maneuverable. And so... Obviously, this container ship was even less maneuverable than that, right? Well, yes, Your Honor, but I would contend... I don't... I think that the actions of the Strangia in this situation were clearly negligent, and I think the jury's finding the Marquette was not negligent. It's certainly sufficiently supported by the evidence to be affirmed on appeal. I will just say for a moment there are competing expert opinions on this topic, right? Marquette had two experts, a ship piloting expert and a tug operations expert, who both said that the actions of Captain Nobles, the captain of the Keefer Bailey... I know, they said they were perfect. And, Your Honor, when this court is reviewing what a jury decided, that's enough. Because the jury was presented with two permissible views of the evidence, and this court might come to a different conclusion if it sat as one of the jurors at the trial. But that's not the standard of review. Well, I may not have to decide this, but you may have to argue it again, because at some point you're going to need to discuss the business about the standard of evidence against the pilot. And that seems like an excellent transition for me to talk about that. So, Your Honor, I think the issue on pilot liability is different, I would frame it differently, than counsel for Mr. Johnson has. So there are a couple things that are very, very clear. Congress has, in Section 8501, delegated the authority to regulate pilots to the states. The Louisiana legislature has, in Section 1137, said, if you want to sue a pilot, you have to prove by clear and convincing negligence that they were grossly negligent. So the question here is not whether the Louisiana legislature has authority to regulate pilots. I don't think I could credibly stand in front of this court and say that they didn't. But our argument is that when Congress said regulate, it is far from clear that Congress intended to give the state legislatures the authority to rewrite substantive admiralty law. And that is our argument. And let me be clear about this. So when Congress gave the states the authority to regulate pilots, there are some things that are clearly within that authority, powers that states have exercised for decades, perhaps even centuries at this point, determining who can become a pilot, how those pilots are educated and trained, how they're licensed, how they're disciplined. Those are all things that clearly fall... Yeah, but you agreed to the standard of evidence, whereas in admiralty it would have been, you know, preponderance, right? That's correct. In admiralty... But it wouldn't have been a gross negligence requirement in admiralty, right? So admiralty law recognizes causes of action both in ordinary negligence and causes of action in gross negligence. Well, wonderful, but the point is you were following the Louisiana law. I'm not sure that I'm ready to concede that, Your Honor. I think what we did is we pled that the pilot had committed gross negligence. You cited that. I mean, that statute was all over the place, right? All the parties were well aware of that statute. The parties are aware of that statute, and we argued, Your Honor, that the Louisiana legislature didn't have the authority to change admiralty law standards of proof, which is why the district court ultimately ruled that preponderance was the standard. So from the get-go, your client was willing to argue this in admiralty as a case of maritime negligence or admiralty negligence against Balkan and gross negligence against the pilot. Correct. You obviously... Yeah, you... I mean, you really impressed the jury. You obviously handled the case very astutely, but I do not see the legal, tactical reason why you would have gone for a higher standard of proof requirement against Pilot Johnson. I'm happy to answer that question, and the reason is because we felt like the facts of this case were more than sufficient to establish gross negligence. You have a pilot who boards the vessel clearly in a rush, orders the captain to heave anchors before he even gets to the wheelhouse and meets the captain face-to-face. To his credit, the captain of the Strangia refused that order. The pilot gets to the wheelhouse, engages in a rushed transfer of pilot... a packed captain pilot transfer, orders the captain to leave anchors and promptly gets on his cell phone, then proceeds to take a cell phone call during the whole time that the Strangia is drifting out into the river. I mean, the evidence at trial... I mean, I will tell you, also, it came out at trial that the Strangia was some 300 to 500 feet into the river at the time of the collision. Pilot Johnson told the Coast Guard after the collision that the Strangia was fully in the anchorage, and he was impeached on that at trial. I don't... I didn't count how many times Pilot Johnson was impeached at trial, but it was a lot. But you would not have sought... If all you had to prove was negligence, you wouldn't have gone for the higher standard, it seems to me, unless you were concerned about the application of the Louisiana statute. Well, obviously, we were aware of the Louisiana statute, and its pilots have been making the argument that that applies in animality cases for a long time, and so certainly we were aware of it. But we presented the district court with an argument that when Congress used the term regulate, they did not mean to give these states authority to rewrite Adam T. Law principles. Well, if regulate controls the standard of negligence, regulate is a very broad term, as we know from everything that comes out of Washington every day. So it's not intuitively... I mean, you don't have a case, you have an a priori argument that it goes to something about pilot qualifications and so on, but not to the procedure in trial. But it seems to me Louisiana, if you commit regulation to the state, they can enhance burden of proof. So a few points to make on that. So one is what regulate means, and I think you have to interpret Congress's use of the term regulate in relation to who is being regulated. So Congress gave states the authority to regulate pilots. As applied to this case, Section 1137 doesn't regulate Pilot Johnson's conduct. What it does is it takes a substantive Adam T. Law right away from Marquette, the owner of the Kiefer Bailey, who's not a pilot. So as Section 1137 operates, it doesn't regulate the pilots, it takes an Adam T. Law... Well, suppose the state decided to say that anybody who's over 18 years old and once takes this exam can be a pilot. No further... I mean, that would be taking away from Marquette the significant protection for safety. So, you know, it is clear that safety is within the essence of the wheelhouse of how you regulate pilots, right? I mean, obviously safety is one of the principal concerns inherent in pilot regulation. So it's not taking away from Marquette any more to say that we're going to require gross negligence and clear and convincing than it is to say, you know, to change the material qualifications for being a pilot. Respectfully, Your Honor, it does. So Marquette, as a coast-wise vessel, is not required to have a state-regulated pilot on board. But what Marquette does have, operating a vessel in U.S. waters, is substantive rights under Adam T. Law. And so when the state of Louisiana says we're going to change the burden of proof applicable to a pilot operating a vessel on navigable waters, they're taking that right away from Marquette. But since these are navigable waters, all of this was under the jurisdiction of Congress to begin with, and Congress gave it to the states, and therefore it's not a question of taking anything away from Marquette, even as you pose it. It's a question of what exactly is encompassed within the breadth of the states. And it's just not intuitively obvious to me, and the briefing doesn't carry me that far is to say that you can split off gross negligence and say that's okay, but you can't take clear and convincing. I don't think this case is implicated by that, but to be clear, Your Honor, I don't think the Louisiana legislature has the authority to say that gross negligence is the standard either. Now, this case isn't implicated by that because we pled gross negligence, we proved gross negligence at trial, which is why I didn't argue that on appeal, because I don't think it's fairly presented by this case. But to be clear, our position is not that the Louisiana legislature can impose a gross negligence standard for pilots, but then that the admiralty standard of proof applies. You can't do either one, so that's totally irrelevant. I'm sorry? So that whole statute is totally irrelevant and preempted, is that what you're saying? That is the argument. When the Louisiana state legislature purported to rewrite substantive admiralty law as to causes of action sounding in admiralty against pilots, that that was overstepping the authority granted to them by Congress. I mean, so other states have similar rules, say a damages cap for pilot liability, would that also go by the wayside? So what other states have is actually a little bit different. I'll take California as an example. So what California does is, they say that when you as the vessel, so in this case the Astrangia, bring a pilot on board, you have to do one of two things. You either have to purchase trip insurance that provides coverage for the pilot's negligence, and if you do that, then obviously that insurance would step in and pay for any negligence committed by the pilot, or if you refuse to buy trip insurance, then you as the vessel owner have to defend and indemnify the pilot for any negligence that the pilot is ultimately found to have. Could a rule like that be preempted or not under your theory, by gentlemen? Not under my theory, because that is a regulation of pilotage, right? Because what the state is regulating there is the interaction between the pilots and their, for lack of a better term, customers, which are the foreign flagged vessels that they come aboard to provide pilotage services to. So what California has said is, if you're going to bring a pilot on board your vessel, you either need to insure them, or you need to defend and indemnify them. That's a regulation of pilots. What Louisiana has done is different, right? What Louisiana has done is say, with respect to innocent third parties, like Marquette, who don't have any contractual relationship with the pilots, the key for Bailey, as I said a moment ago, is not required, is not subject to the pilot rules, because it's a U.S. flagged vessel. Congress has exempted U.S. flagged vessels from state pilotage. So here you have an innocent third party who has no interaction with the pilotage regime who's being told by a state legislature, your substantive rights under federal adamantee law are different when you sue a pilot. And my argument is, if Congress wanted to affect that result, they needed to say so explicitly. And the use of the term regulate doesn't affect that result. I don't understand that, because the fact that admiralty is in the Constitution, Congress has the right to derogate or change admiralty at any time, does it not? Yeah, Congress has the authority under the Constitution to regulate adamantee law, absolutely. Right, so you're saying that they... that even though they chose to give it wholly over to the states to regulate pilotage, they didn't do admiralty, and I don't see any basis for claiming that reservation. So what my argument is... I mean, I understand the California law. I'm sure other states are different, but it doesn't prove to me that only California is right and Louisiana's wrong. And that's not... I was just trying to answer Judge Duncan's question about what other states did. I think my argument, the most succinctly I can put it, and then I would, if the court will let me, like to move on to another point, but as most succinctly as I can put it, Congress may well have had the authority to delegate, you know, things to the states, like, for example, Section 1137, but my point is that if Congress wanted to delegate the authority to change admiralty law to the states, it needed to be a lot more explicit than it was when it used the term regulate pilotage. Because it's not intuitive to me, and I can see that Your Honor and I may disagree on that, and I certainly respect that, but it's not intuitive to me that the term regulate pilotage also includes changed substantive admiralty rights of third parties. The last point I want to make on this, and then I want to address Balkan's damages, is the court asked if there was any case law that supports my position. I think the parties have been... Mr. Johnson and the Amici have been varying degrees of clear on this. There is one case that has directly addressed this question that is an unreported intermediate state appellate court case from the Louisiana Third Circuit Court of Appeal that held with no analysis whatsoever essentially that Mr. Johnson is correct. So I think the court is writing on a blank slate with respect to this issue. There are certainly district court cases that have accepted Section 1137 as the law without analyzing whether that was a... whether Congress intended to delegate that authority, but I think no court, certainly no federal circuit court, I can say with confidence, has directly decided this issue. So to move to Balkan's damages just briefly, I think that there's a difference between the question that the jury answered and the question that Balkan is arguing here. Balkan is saying it was clearly wrong for the jury to say that they sustained no damages. I think what the jury found was slightly different than that. What the jury found was that Balkan had proven zero dollars of damages, and I think that's a distinction with a difference, because what Balkan offered as proof of its damages was the testimony of an employee of one of the Bulgarian companies. That employee was impeached multiple times. He was forced to admit on cross-examination that several elements of the claim were clearly unrelated to the incident. You have a hole in the side of the vessel, so even under the most minimal standard, that looks like a clear error to me. So let me be clear. Balkan sustained damages in the collision. Yeah. I can't and don't dispute that, but it was Balkan's burden of proof to prove by a preponderance of the evidence what dollar amount would compensate it for that damage. But it really does seem very bizarre. They're only claiming $107,000 for the damage to the hull, whereas you claimed all of $47,000 to a barge, which, you know, so they're almost offsetting. And so I don't see how impeaching their witness goes to overcome the idea that they've got a hole in their hull. They do, Judge, and I don't think anybody has disputed that, but they also have to prove to the jury what the value is, what it costs to repair that. And the problem is... The jury could have given them $10,000, couldn't it? Well, I would argue... The jury could have awarded any number, but that number ultimately has to be supported by admissible and credible evidence in the record. And the problem here was Balkan didn't just claim $107,000 of physical damage. They also claimed a significant loss-of-use claim with respect to the loss of a charter. It doesn't matter. I mean, if you ran over a bunch of, you know... If your car ran over a bunch of tacks in the road and then you ran into a telephone pole and damaged the front of your car, if somebody dropped the tacks in the road, you're still entitled to new tires. And I hate to be so simplistic about it, but it just seems to me bizarre. May I answer the Court's question? I see my time has expired. Sure. No question you're entitled to new tires under that scenario, but I would argue that you're also required to prove to the finder of fact what those new tires cost. Well, I know that, but that's exactly what they said you didn't do, and I'm not going to give you a chance to answer because that's only $47,000, and we have it well briefed. And you've had 30 minutes. Thank you, Your Honor. And I thank you very much. Very spirited. Thank you. All right. All right, Mr. DePaola. Thank you, Your Honors, and I'll be very brief. There's just a couple of issues I want to point out on rebuttal. On the jurisdictional argument, I find it just interesting that Your Honor asked for proof in the record, and I'm not going to dispute that Marquette's vessel is a U.S. flag vessel. I don't know that there's actual evidence in the record of that, but I'm not disputing that. It's clear that that is, and it is the law that you have to be a U.S. citizen. But it's interesting to me that when the question comes up, they spend eight pages and don't answer the question. And so it makes you wonder why, because they clearly could have just said they're a U.S. citizen because of XYZ, and it's fine, and we don't have any foreign members, and then there's complete diversity between my client and their client, and it's no big deal. But they didn't do that, despite being asked, which I think kind of raises the question, I know that's what the Jones Act requires, but why didn't they just say that? The other thing is, and you asked an interesting question, that Marquette never actually pleaded in any other jurisdiction on their initial claim than diversity. So if you look in the record and there's no evidence of it, they technically don't have it at all. I'm not saying you can't consent to a jury trial in an amnesty case, but you don't get a right to a jury trial in an amnesty case. You only get the right to a jury trial in a diversity case. As I said before, and it's fully briefed, I understand we didn't object on the grounds of diversity to the trial court on jury. I'm not backing away from that, but we did object, and I think that any objection is not consent, if that makes sense. They only pled diversity? Correct. The other thing I'll point out, going back to the issue, too, that I've raised, which is the statutory violation. Can I ask a question on this diversity of citizenship? This was a limited partnership, right, that you're asking about, that you're talking about? My understanding is Marquette is an LLC. Yeah. Now, so nobody got into the weeds on who the constituents were to this, did they? Correct. There's not any evidence in the record about who the other members are or things of that nature, no. And nobody put any evidence in about that? Correct. And nobody thought that was strange, that there was no evidence put in about that? And nobody ask any questions? Nobody said to the judge, we need to have evidence of that? Nobody said that, no, Your Honor. I miss it. Ma'am? I'm missing. Why was that? I don't know, frankly. I mean, I don't know why we didn't say that. I mean, I think it's incumbent upon them to plead in the first instance, and they didn't. I mean, obviously, the court raised it on appeal, which you can do. I think it is an issue. But I can't say why no one asked the court that. They didn't present evidence of it, and we didn't controversy that. So everybody was in league on this point. We're not going to get into the weeds. That was the consensus of all the lawyers present, right? We're not going to get into the weeds on citizenship. Basically. You made that decision. Everybody made that decision, because nobody got into the weeds. It's pretty common. We get these cases all the time. It's pretty common for lawyers in the case to think they need to get into the weeds. But here, everybody was in agreement. We're all just going to stay silent. And now we're going to go to the court of appeals. We're going to say, oh, my, there's a problem here. Right? Well, to be fair, we did not. We did not get into the weeds of it. To be fair, we didn't really bring it up on appeal. It was brought up by the court on its own. I will say that it's just abnormal. I mean, I do primarily amnesty work all the time. I've never had a diversity case pled, and never had a collision case go to a jury. But that's not an excuse. But I didn't bring it up on appeal. I'm just addressing the court's question on appeal of diversity jurisdiction, and going back to that it's not properly pled. The other thing, quickly, is the sufficiency of the evidence argument that counsel brought up. As I've said before, we're not arguing sufficiency of the evidence. We're arguing a clear statutory violation. We're arguing that it defies logic that we've been given zero damages in this case. When there's a clear hole in the side of the vessel, no one controverted the repair damages. So, at the very least, that should have been awarded. If the Keeper Bailey doesn't slow down and hits a vessel, that's a violation. And we didn't put it in our brief because it's sufficiently to prevent collision, because we're obviously talking about a collision. So it obviously happened. So that is a strict compliance issue that the jury just ignored. And thank you. All right. Thank you, sir. Mr. Davis. Yes, Judge, thank you. So I haven't heard anything responding or addressing the issue of the accident reconstruction video, so I'm not sure there's any rebuttal that's appropriate there. I did mention in my argument earlier a reference to the Imgur proof of sex on this issue, and I looked at it. It's not actually cited, so I'd like to just read that citation. Imgur proof of sex says, quote, in order to have a computer animation or simulation admitted into evidence, the proponent of that evidence generally must acquire and have an expert in computer reconstruction or animation testify at trial. That's Imgur proof of sex, third edition, 455, section 12. Was that in your brief? No, Judge, that's why I just . . . That's whose proof of fax? American Jurisprudence proof of fax, the treatise. Oh. On the issue of the standard of negligence or standard of evidence for the pilot, I heard a few arguments, and Judge Jones, I appreciate some of your questions. I appreciate all of your questions, but some in particular. Maybe I can adopt them because I think . . . Well, it's a difficult issue, and I was just pressing it. I think your questions raised several of the points I would make. The notion that regulate doesn't mean what it says and only means that you can regulate things like rates and licensure. Just very briefly, to your point, Judge Jones, then there's no reason that gross negligence would be enforceable and not an evidentiary standard. There's no principle difference between the two. Moreover, Section 8501 doesn't say anything about a limitation on regulation. It's not appropriate to read that into the statute. Congress has shown that when it wants to limit 8501, it knows how to do that. It's done that in 8501, for instance, when it said that discriminatory rate systems are prohibited. It's done that in 8502 where it said, okay, now we're going to look at coast-wise trade, specifically Jones Act vessels. Those cannot be regulated. Sorry, pilotage of those cannot be regulated by the states. It's done that in 9302 where it looked at vessels on the Great Lakes and says those pilotage cannot be regulated by the states. So Congress knows very well how to put limits on Section 8501 when it believes they're appropriate. The liability statutes at issue in this case and in the other cases that Judge Duncan, you raised, have been in place for almost 40 years, most of them. Congress has had 40 years to look at those issues and say, hey, wait a second, when we said regulate, we didn't mean liability standards or evidentiary standards. And I think the Wilson case, Wilson v. McNamee, which is an 1880 Supreme Court case, but it says very clearly that the long-continued silence of Congress with its plenary power in the presence of such legislation by the states concerned is itself an implied gratification and adoption and is equivalent in its consequences to an express declaration to that effect. Congress knows how to modify 8501 if it wants to. It hasn't done so and the Court should not read a modification into it. And last point on that issue, Koch v. U.S. or I'm sorry, Koch, which was a U.S. Supreme Court decision in 1947, used the phrase full power. It said states have had full power to regulate pilotage of certain kinds of vessels since 1789. Again, not limited power, not full power within certain modifications, full power. If we agree with you on that point and by hypothesis we don't think we have the authority to reweigh the evidence, what's the result? I believe in that case it would be appropriate to remand and I think it could be remanded specifically on the issue of whether the negligence or the gross negligence of the pilot can be proven by clear and convincing evidence. I do not think it necessarily requires a full trial as to the world of everything. I think it could be a trial on that issue. You're saying as a matter of law they didn't make proof by clear and convincing? Correct. Or as a matter of law, or it could be submitted again as a bench trial. And actually to bring in a comment that Judge King made on the citizenship and diversity issue, I specifically, I haven't raised that issue because all of the claims against my client are pled strictly in admiralty. So frankly, I didn't look at the diversity allegations because they had nothing to do with the claims against me. I think if it was remanded for a trial as to my client, it could certainly be done as a bench trial. There's no right under any claim against him to a jury. And the final point I'd like to make... There's a co-defendant. There is a co-defendant who would also be subject to admiralty jurisdiction. Well, I understand that, but what I'm saying is I don't see how it could possibly be limited to you. I think it would have to be both co-defendants because of comparative negligence. Yes. Well, or it could be just a determination that the claim against the pilot did not meet the appropriate burden and therefore he's dismissed. My time is up. Yes. Thank you, Judge. Thank you very much.